UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAUL BRENNER,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        No.  4:12CV1724 RWS
                                       )                        (TIA)
CAROLYN W. COLVIN,[1]                  )
ACTING COMMISSIONER OF                 )
SOCIAL SECURITY,                       )
                                       )
            Defendant.                 )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for

judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II

of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act.

The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).

## I.  Procedural History

On June 22, 2009, Plaintiff filed an application for Supplemental Security Income.  (Tr. 266-

70)  He filed an application for Disability Insurance Benefits on June 24, 2009.  (Tr. 259-65)  In both

applications, he claimed that he became unable to work on September 14, 2006[2] due to compression

fractures in his lower back and problems with his right knee.  (Tr. 121, 259, 266)  The applications

were denied on August 28, 2009, after which Plaintiff requested a hearing before an Administrative

_____

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
substituted for Michael J. Astrue as the Defendant in this action.

[2]  Plaintiff later amended the alleged onset date to October 4, 2008.  (Tr. 9)

Law Judge ("ALJ").  (Tr. 103-05, 121-29)  On June 16, 2010, Plaintiff testified at a hearing before the ALJ.  (Tr. 64-95)   He appeared at a Supplemental Hearing on February 4, 2011.  (Tr. 24-63)  In a decision dated March 21, 2011, the ALJ found that Plaintiff had not been under a disability from October 4, 2008 through the date of the decision.  (Tr. 9-17)  The Appeals Council denied Plaintiff's request for review on July 25, 2012.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At both hearings before the ALJ, Plaintiff was represented by counsel.  The ALJ first questioned Plaintiff , who testified that he was married with six children.  He was 35 years old at the time of the hearing.  He lived in a mobile home with his wife and three of his children, ages 7, 6, and 4.  His other three children, ages 9, 11, and 16, visited on the weekends.  Plaintiff testified that he dropped out of school in the eighth grade and did not have a GED.  His first job was washing dishes, and he later performed labor and construction work.  Plaintiff weighed 140 pounds and measured 5 feet, 5 inches.  He could not read very well and never held a job requiring him to read instructions or maps.  Plaintiff was able to read road signs when driving.  (Tr. 68-71)

Plaintiff further testified that his wife cooked and took care of the children.  Plaintiff woke them up for school in the morning.  His wife worked from seven to four, while the kids were at school.  Plaintiff stated that he could perform simple addition such as counting money and making change at a store.  He did not write well but tried to the best of his ability.  Plaintiff did not write notes for his children or checks.  He spent time in jail for traffic tickets and a burglary charge.  His wife's income was his only source of money, and he received health insurance through Medicaid.

Further, Plaintiff testified that he previously received a settlement for a Worker's Compensation claim after injuring his eye. (Tr. 72-75)

Plaintiff also testified regarding previous jobs. He stated that his past jobs included a general laborer for a temp agency, setting up tents and tables for picnics and parties; a mover, picking up and moving furniture; a security guard, checking people in and out of a parking lot, monitoring the cash registers, and helping with shoplifting arrests; an auto detailer, cleaning the interiors and exteriors of cars and doing light mechanical work; a lawn service worker, cutting grass and weed eating; and a window cleaner, cleaning windows in high rise buildings. For one of the detail companies, Plaintiff was required to write out bills. (Tr. 75-80)

With regard to Plaintiff's medical conditions, he stated that back surgery was not an option and that doctors treated his back with pain medication. He injured his back driving off a 70 foot wall when he was 16. Plaintiff received treatment until he was 18 and then did not receive further help until he enrolled in Medicaid. If his back began to hurt badly, he would go to the emergency room. In addition, Plaintiff had problems with his right knee and his legs. Plaintiff had two surgeries on his right knee, with the last surgery taking place in 2007. He also received Cortisone shots. Further, Plaintiff underwent elbow surgery to relieve a pinched nerve. He performed exercises at home because insurance did not cover physical therapy. Plaintiff additionally experienced pain in his right hand, wrist, upper arm, and side of neck. He took prescription medication including Percocet, OxyContin, Volarin, Flexeril, Xanax, Prozac, Neurontin, and a Lidoderm patch. Dr. Richardson prescribed all of the medications. Side effects from the prescriptions included dizziness, fatigue, light headedness, loss of appetite, and constipation. (Tr. 81-85)

Plaintiff further testified that he had three cats and a small Jack Russell Terrier. His wife fed the pets before she left for work. Plaintiff was able to fix sandwiches and make TV dinners. He only drove once a month to the doctor's office. Plaintiff used a cane, which his doctor recommended but did not prescribe. Plaintiff stopped using the computer about a year ago because the medications made the screen look blurry. The ALJ noted that orthopedic surgery notes recommended that Plaintiff return to the gym and exercise, which Plaintiff explained referred to physical therapy. Plaintiff previously reported feeling pain in his elbow when throwing a ball to his dog. (Tr. 85-87)

Plaintiff stated that he did not drink alcohol but did smoke cigarettes. His doctors encouraged him to stop smoking, but Plaintiff had no success in his attempts to quit. Plaintiff's wife did all the cooking, laundry, vacuuming, and shopping. Plaintiff was able to scrape food off plates and put the plates in the sink. On a normal day, Plaintiff woke up his kids, helped them get dressed and on the bus, and lay back down. He believed he could walk 5 minutes before needing to rest due to pain. He could stand for 10 or 15 minutes before his back and legs began to hurt. Sitting was uncomfortable, and Plaintiff opined he could sit for only 10 to 15 minutes as well. He could lift 5 to 10 pounds, and he never picked up the pets or his four-year-old child. (Tr. 88-90)

Plaintiff's attorney also questioned Plaintiff about his impairments. Plaintiff stated that he was unable to lift his right arm over his head without pain. He had trouble with balance, and he experienced pain when going up or down a few steps. Plaintiff had back pain every day, all day. Most days, his pain was between an eight and a ten, on a scale of one to ten. Laying down helped alleviate the pain, which Plaintiff did for at least 12 to 13 hours during the day. Plaintiff further testified that his medication made him drowsy, causing him to fall asleep. In addition, the medication

caused problems with memory and concentration, as well as constant dizziness and light headedness. The pain medication dulls the pain a little.  (Tr. 90-93)

Plaintiff also stated that his job as a security guard required him to chase, catch, and handcuff shoplifters five to six times a day.  In addition to back and right arm pain, Plaintiff testified that his right knee gave out a lot and that he sometimes fell if his did not have his cane ready.  Plaintiff took Xanax for panic attacks, which helped a little.  He did not have an active social life and stated that he did not feel like talking to anybody.  (Tr. 93-94)

The ALJ then stated that he was sending Plaintiff for orthopedic, psychological, and IQ evaluations.  After the evaluations were completed, the ALJ would decide whether to hold a supplemental hearing.  (Tr. 94-95)

On February 4, 2011, the ALJ held a supplemental hearing, which included testimony from the Plaintiff, two medical experts ("ME"), and a vocational expert ("VE").  The ALJ noted new exhibits and an additional document with medical evidence relating to complaints of range of motion in the neck, problems with a popping and grinding, and shoulder and elbow pain.  Plaintiff's attorney then questioned Plaintiff regarding his physical restrictions.  Plaintiff stated that his restrictions had not changed since the first hearing.  He also complained of abdominal cramps in his lower right side, which sometimes switched to the left side.  An ultrasound and CT scan showed kidney stones in both kidneys, but doctors thought the pain could be from irritable bowel syndrome or Crohn's disease. He experienced this pain once or twice a week, for which he took medication and lay down.  Plaintiff further stated that he continued to lay down 12 to 13 hours a day and he slept restlessly during the night.  With regard to anxiety, Plaintiff testified that every once in awhile, he became depressed and felt tingly in his chest and upper body, causing him to pass out.  If he felt an episode coming on, he

took medication, which prevented him from passing out. He experienced these episodes once or twice a week. Plaintiff continued to use a cane but stated that sometimes in the morning he could walk without it. (Tr. 26-30)

Plaintiff further testified that he had problems with his shoulder and neck. He experienced cramps in his neck, along with grinding when he lifted his arm above his head. He also had popping, which caused his neck to hurt, as well as pain down his elbow and into his forearm, wrist, and fingers. His pain and restrictions in his low back remained the same. (Tr. 30-31)

The ALJ noted that Plaintiff's doctor was providing pain management injections once a month. Plaintiff also continued to take pain medications and anti-anxiety medications, as well as new medications, including Gabapentin, Rocentamof, Dicofenac, Fexofendine, Dicyclomine, and Mucinex. Plaintiff additionally sought Vicodin. (Tr. 31-35)

Next, the ME, Dr. Winkler, testified at the hearing. Dr. Winkler stated that Plaintiff had an old mild L5 compression fracture and previously had knee surgery for plica syndrome and to correct a small synovial cyst. In addition, Plaintiff had right ulnar nerve impingement syndrome, corrected with transposition surgery. Finally, Dr. Winkler noted mild cervical spine degenerative disk disease. Based on these medical conditions, Dr. Winkler opined that Plaintiff did not meet or equal any of the listings. However, his chronic low back pain, knee surgery, ulnar nerve transposition, and cervical spine degenerative disk disease caused some minor impairments that would limit some of his work activities. Dr. Winkler noted that Plaintiff's chronic low back symptoms were out of proportion with expected symptoms based on the x-ray and MRI findings. (Tr. 35-37)

Dr. Winkler opined that Plaintiff would be able to lift and carry 50 pounds occasionally and 20 pounds frequently; stand at least six hours in an eight-hour workday; sit for unlimited amounts of

time; occasionally climb stairs, and ramps; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; and occasionally crawl. Dr. Winkler also noted that Plaintiff would have no manipulative, visual, or communicative limits. With regard to environmental limitations, Plaintiff should avoid extreme exposure to cold, wetness, humidity, and unprotected heights. He did not need to avoid vibration, and Plaintiff had no limitations to reaching over head or in any direction. (Tr. 37-38)

Plaintiff's attorney also questioned the ME, who stated that he was a rheumatologist, not an orthopedist or neurosurgeon. In addition, he did not review the actual films when determining that Plaintiff's compression fracture and cervical disk pathology were mild. Dr. Winkler agreed that Plaintiff had multiple complaints of pain and obtained pain medication from several different physicians. Dr. Winkler noted that possible reasons for patients to give inconsistent histories could be that things have changed, they have bad memory, they have a low IQ, or they are not being honest about their symptomology. However, consistency does not equate to honesty; it means the patient tells the story the same way on a regular basis. Dr. Winkler acknowledged that he had not examined Plaintiff and that the limitations Dr. Winkler placed on Plaintiff were much less severe than those given by the treating physician. (Tr. 38-41)

Next, the second ME, clinical psychologist Dr. James D. Reid, testified regarding Plaintiff's psychiatric issues. Dr. Reid first asked Plaintiff why he did not follow up with treatment from psychiatrist Herman Witty in 2006. Plaintiff stated that his insurance would not cover treatment, and he did not have income to pay for treatment. Dr. Reid noted that Plaintiff received a diagnosis in 2006 indicating a pain disorder associated with both psychological and general medical condition, which his treating sources were unaware of. Dr. Reid opined that this somatoform disorder was an

important area to look at more thoroughly. Specifically, Dr. Reid stated that Plaintiff's treating sources indicated that he could not work, yet the constant reports of pain and taking opioid medications for such a long time signaled something more psychological. (Tr. 42-45)

Dr. Reid noted Plaintiff's past history of cocaine and marijuana problems and stated that the opioid pain medications raised concern about an addictive disorder. Plaintiff also had a somatoform disorder but did not follow up with a mental health professional. Dr. Reid additionally noted a depressive disorder, not otherwise specified, with a Global Assessment Functioning ("GAF") of 60 to 65, along with anxiety. Dr. Reid mentioned Plaintiff's testimony that he became depressed, experienced physical symptoms, and then took anti-anxiety medication. Dr. Reid noted that this was a classic presentation of a somatoform disorder where one converts psychological pain, conflict and pain, into physical symptoms. However, despite prescriptions for Xanax and Prozac, the record contained no evidence of panic attacks or description for a diagnosis of major depressive disorder or anxiety disorder. Plaintiff's IQ was 72, lower than school records of 84 and 90. His Wechsler Memory Scale produced a low score, but the file did not contain evidence of memory or cognitive deficits, which led Dr. Reid to wonder whether Plaintiff was exaggerating. (Tr. 45-47)

If Dr. Reid considered borderline intellectual functioning under 12.02 of the listings, depressive disorder under 12.04, anxiety under 12.06, or somatoform disorders under 12.07, Plaintiff did not meet the B Criteria. Dr. Reid noted that the consultative examiner found only moderate, not marked, limitations. The examiner also noted the possibility that Plaintiff was deliberately faking a poor adjustment based on his scores on all the traditional validity indicators. Dr. Reid further stated that Plaintiff's drop in IQ could be due to continuously using numerous opioid medications in that his intelligence hadn't decreased, but the narcotic medicines interfered with his cognition. Dr. Reid

opined that Plaintiff was mildly impaired as to activities of daily living and mildly impaired in social functioning. His concentration, persistence, and pace were mildly impaired for simple, routine, repetitive tasks with limited interactions with supervisors, co-workers, and the public. In addition, Plaintiff had moderate limitations for complex tasks that required frequent changes in interactions with co-workers, public, or supervisors. There was no evidence of repeated episodes of deterioration of an extended duration. (Tr. 47-51)

Plaintiff's attorney questioned Dr. Reid regarding evidence of anxiety attacks. Dr. Reid noted that the medical evidence contained labels of anxiety but no descriptions of panic attacks. Plaintiff's attorney produced a record of seven visits indicating a history of anxiety attacks. However, Dr. Reid noted that the records did not have descriptions of these anxiety attacks. Plaintiff's testimony of his symptoms was consistent with the definition of an anxiety attack, but he had not been referred to a psychiatrist for follow-up treatment. In addition, the attorney noted that Plaintiff had an IEP and was in special education. Dr. Reid stated that the records did not specify the nature of any disability, which could have been a behavior disorder. He also interpreted school records to reflect that Plaintiff was in learning disabled classes, with low average verbal abilities, average performance abilities, and low average full scale IQ. Finally, the ALJ noted that Plaintiff previously reported that he had a learning disability due to behavior problems. (Tr. 51-56)

A VE, Delores Elvira Gonzales, also testified at the hearing. She noted that Plaintiff's vocational history over the past 15 years included auto detailer, which was medium, unskilled work; mechanic, which was light, skilled work; landscape laborer, which was heavy, unskilled work; window cleaner, which was medium, unskilled work; security guard, which was light, semi-skilled

work; car valet, which was light, unskilled work; lawn mower, which was medium, semi-skilled work; and banquet setup person, which was medium, unskilled work. (Tr. 56-58)

The ALJ first asked the VE to assume a hypothetical individual with Plaintiff's education, training, and work experience. He could perform medium work with the following limitations: occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; occasionally crouch; never crawl; and avoid concentrated exposure to extreme cold, wetness, humidity, and hazards of heights. The person could understand, remember, and carry out simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task oriented setting with casual and infrequent contact with others; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace. The VE stated that this individual could perform Plaintiff's past work in the auto detailer and banquet setup positions. (Tr. 58-59)

For the second hypothetical, the ALJ modified the first hypothetical to include light work and an ability to respond appropriately to supervisors in a task oriented setting where contact with co-workers and others was casual and infrequent. The VE answered that the banquet setup position required working with others, while the auto detailer usually involved independent work. In addition to the auto detailer position possibly meeting the criteria, the VE also stated that the individual could work as an addresser, which was sedentary and unskilled. (Tr. 59-60)

The third hypothetical was the same as the second but included at least two absences per month, meaning tardies, no-shows, or early leave, due to anxiety and mental conditions. The VE testified that at that rate of absenteeism or tardiness, the person would need to be accommodated and would not be able to work competitively. (Tr. 60-61)

Plaintiff's attorney also questioned the VE, who noted that competitive employment allowed one 15-minute break in the morning, one lunch break for either a half hour or an hour, and another 15-minute break in the afternoon. If a person needed to take more breaks due to pain, the effects of medication, the need to lie down, the effects of anxiety, or the need to attend doctor appointments, he would be unable to work competitively. Specifically, the RFC finding by Dr. Morris, the consultative examiner, would preclude any competitive employment. Further, the RFC determination by Dr. Richardson would preclude work based on the restrictions to standing, walking, and sitting. If the VE returned to the first hypothetical but included an inability to carry anything overhead with the right arm; inability to do any overhead work or overhead reaching with the right arm; and inability to handle, finger, feel, push, or pull, the person could not work competitively. (Tr. 61-62)

In a Disability Report – Adult, Plaintiff reported that he was unable to work due to compression fractures in his lower back and problems with his right knee. He stated that he was unable to bend or sit/stand too long. (Tr. 288-89)

Plaintiff completed a Function Report – Adult on July 10, 2009. He reported that he was able to feed the pets, but his wife walked and bathed the dog. He had problems sleeping because he couldn't find a comfortable position. He also had problems getting in and out of the tub. Plaintiff was able to prepare sandwiches and TV dinners, and he made breakfast and lunch daily. He did not cook meals because his back hurt when standing too long. He did not perform house or yard work, and he no longer drove because his medications made him drowsy. In addition, sitting too long in one position increased his pain. His hobbies included watching TV and sleeping on a daily basis. He attended monthly doctor visits but seldom went out, especially if he was required to stand or sit for more than 15 minutes. Plaintiff reported being impatient and short-tempered with others because he

was frustrated by his inability to participate in physical activities. His conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, complete tasks, and understand. He could only walk for about 15 minutes before needed to rest. His ability to pay attention depended on his medications. Plaintiff did not follow written instructions well, and he followed spoken instructions better than written. He took anti-anxiety medications to handle stress. He reported using a cane, which his doctor suggested. Plaintiff summarized that his pain level varied from day to day. Some days he did not get out of bed unless necessary, and other days he could function and go outside for a few minutes or sit on the porch with his dog. (Tr. 297-304)

In a letter dated November 14, 2006, a representative the St. Louis Public School District indicated that Plaintiff had an IEP and received special education services. (Tr. 324-25)

### III. Medical Evidence

The Plaintiff failed to set forth the relevant medical evidence supporting his claim for disability and supplemental security income benefits. However, upon review of the transcript provided by the Defendant, the Court sets out the following medical evidence:

Records from SLUCare in 2005 revealed that Plaintiff twisted his right knee, requiring arthroscopy and partial medial meniscectomy. Two weeks after surgery, he had full range of motion, with no swelling and full passive range. He was on workouts and planned to return to work. Seven weeks post-surgery, Plaintiff complained of minimal symptoms of intermittent achiness. However, he showed full range of passive and active motion with some concentric thigh atrophy. Dr. David Kieffer advised Plaintiff to return to the gym and start an independent rehab program that included strengthening exercises, squatting, and weightlifting. Plaintiff was to return on a per needed basis. (Tr. 656-64)

Plaintiff saw Herman Witte, M.D., for psychiatric treatment on four occasions between January and March of 2006. Although the hand-written notes are barely legible, Dr. Witte noted that Plaintiff mentioned anxiety attacks and trouble sleeping. Plaintiff also discussed his previous accident and compression fracture in his back, for which he took medication. He complained of chronic pain. Dr. Witte noted that the goal was to decrease pain and decrease the depression and anxiety. (Tr. 354-57)

Dr. William R. Richardson saw Plaintiff on numerous occasions between 2005 and early 2011. (Tr. 388-449, 524-41, 611-617, 819-26) The hand-written progress notes contain very little objective testing and primarily indicate complaints of pain resulting in monthly prescription refills for pain medications such as Hydrocodone and OxyContin, as well as anti-anxiety medications. For instance, on July 12, 2006, Plaintiff complained of constant back pain. Dr. Richardson noted that Plaintiff was tender to palpation in the upper lumbar area and had limited range of motion. Dr. Richardson assessed chronic back pain and refilled Plaintiff's prescriptions for OxyContin, Hydrocodone, Prozac, and Xanax. Dr. Richardson also noted that Plaintiff was applying for disability. (Tr. 441) On January 3, 2007, Dr. Richardson administered 4 trigger point injections and refilled Plaintiff's Hydrocodone prescription. (Tr. 419)

On February 8, 2007, Plaintiff complained of right knee pain. Dr. Richardson noted that an x-ray performed in the ER was negative. He scheduled Plaintiff for an MRI. (Tr. 434) Dr. Richardson indicated on February 13, 2007 that the right knee MRI was negative and that Plaintiff was feeling better. (Tr. 433) However, a November 27, 2007 MRI showed medical meniscus posterior horn intrasubstance degeneration and a small lateral meniscus cyst. Dr. David A. Kieffer of St. Louis University Hospital Orthopaedic Surgery planned to perform right knee arthroscopy with

lateral meniscal cyst excision. One week post-surgery, on February 5, 2008, Dr. Kieffer noted that Plaintiff had no swelling and had full passive range of motion. Plaintiff was placed in a brown stocking and instructed to perform advanced independent rehabilitation. When Plaintiff returned six weeks after surgery complaining of peripatellar ache, Dr. Kieffer noted thigh atrophy and advised Plaintiff to return to gym work and advanced independent exercise pattern. Plaintiff's condition improved, and on April 17, 2008, Dr. Kieffer released Plaintiff for per needed follow up and emphasized bicycling and thigh-strengthening exercises. (Tr. 480-89)

Dr. Richardson continued to administer trigger point injections in 2008; however, Plaintiff continued to complain of increased back pain.[3] (Tr. 410-21) On August 19, 2008, Dr. Richardson prescribed OxyContin and scheduled an x-ray of Plaintiff's lumbar spine. (Tr. 409, 741) The x-ray taken on that same date revealed a mild compression deformity of L5 with less than 25% loss of height of the vertebral body. Otherwise, the vertebral body was of normal height and alignment. The pedicles were intact, and the intervertebral disc space height was well preserved. (Tr. 742)

Dr. Richardson's progress notes also indicate that Plaintiff underwent an MRI of the lumbar spine on August 29, 2008, which indicated some flattening at L4-5. (Tr. 407) On October 30, 2008, Plaintiff reported doing well and that the medications were helping. (Tr. 406) Plaintiff saw Dr. John A. Garcia on December 8, 2008 for complaints of lower back and hip pain. Dr. Garcia assessed degenerative disc disease, dysthymia, and tension headaches. He prescribed medications, including Vicodin and Cymbalta. (Tr. 521-23)

---

[3] The medical record indicates that Plaintiff presented to St. Anthony's Fenton Urgent Care on several occasions between August 2008 and January 2009 for complaints including back pain, hip pain, and tooth pain. (Tr. 358-86)

Plaintiff renewed his complaints of right knee pain during an appointment with Dr. Richardson on December 19, 2008, and he continued to complain of back pain. Dr. Richardson administered trigger point injections and prescribed narcotic pain medications. (Tr. 395-405, 529-34) Plaintiff returned to Dr. Garcia in January, 2009, complaining of shoulder pain, stiff neck, and knee locking up. Dr. Garcia assessed right shoulder pain, muscle spasm, and neck pain. He prescribed medication and also administered trigger point injections. (Tr. 520) On April 23, 2009, Plaintiff saw Dr. Kiefer for complaints of left knee pain. Dr. Kiefer recommended an MRI and prescribed Darvocet. (Tr. 453)

Plaintiff began complaining of right elbow pain in May, 2009. (Tr. 394, 512-18) Dr. Garcia evaluated Plaintiff on June 23, 2009 for complaints of right elbow pain radiating to his hand. Dr. Garcia noted that the x-ray was negative and that Plaintiff was requesting Vicodin. He assessed right elbow pain, neuropathy, and tobacco use disorder. He referred Plaintiff to an orthopaedist. (Tr. 511) Plaintiff also saw Dr. Richardson on July 14, 2009 for elbow pain. Dr. Richardson administered 4 trigger point injections and renewed several prescriptions, including Percocet and Prozac. (Tr. 527)

On July 22, 2009, Dr. Scott G. Kaar evaluated Plaintiff for right elbow pain and numbness in his ring and smal fingers. Plaintiff also mentioned neck pain for the past 2 months. Plaintiff stated that he worked in manual labor as an auto detailer. Dr. Kaar noted a history of multiple knee surgeries and anxiety. A 15-point review of systems was positive for joint pain, swelling, weakness, and anxiety but was otherwise negative. Dr. Kaar assessed right elbow ulnar neuropathy at the elbow which could be related to compression from his neck. He referred Plaintiff for an EMG nerve conduction study and ordered night-time elbow splinting. (Tr. 467) When Plaintiff returned to Dr. Kaar on August 26, 2009, Plaintiff reported improvement in his elbow from wearing the splint.

15

However, the pain returned after throwing a ball. He reported no new symptoms, neck symptoms, or other areas of complaints. Dr. Kaar noted that the x-rays and EMG did not demonstrate abnormalities. (Tr. 465)

Plaintiff returned to Dr. Garcia on September 1, 2009 and indicated that he did not like Dr. Kaar and wanted to see someone else. An MRI performed on September 3, 2009 revealed fluid collection surrounding the ulnar nerve with mild edema, suggestive of inflammatory changes and possible neuritis. Plaintiff continued to complain of right elbow pain, and on September 10 said that Vicodin did not help, but Plaintiff then requested Vicodin on September 22, 2009. (Tr. 504-07) On September 8 and October 6, 2009, Plaintiff returned to Dr. Richardson for complaints of pain. Dr. Richardson prescribed Percocet and OxyContin. (Tr. 524-25)

Plaintiff presented to Washington University Orthopedics on October 6, 2009. He complained of right elbow pain and reported that an elbow pad and elbow brace provided no relief. He listed his medications as Vicodin and Gavapentin. Plaintiff was in no distress. Dr. Martin Boyer noted that Plaintiff had an MRI and nerve conduction study for reasons that were unclear. He assessed medical epicondylitis and gave Plaintiff an injection. Plaintiff returned to Dr. Boyer on November 17, 2009 for complaints of elbow pain. Dr. Boyer opined that Plaintiff needed a medial epicondylectomy and ulnar nerve transposition, and he referred Plaintiff to Dr. Jay Keener. (Tr. 580-93)

Plaintiff presented to urgent care in Fenton on October 28, 2009 complaining of a foot injury. He also presented to care at Big Bend on November 30, 2009, complaining of elbow pain, for which was prescribed Vicodin. (Tr. 573-79, 643) On November 3,2009, December 4, 2009, and January 5, 2010, Dr. Richardson examined Plaintiff, and refilled Plaintiff's prescriptions for Percocet and OxyContin. (Tr. 611-13)

On December 14, 2009, Dr. Jay Keener evaluated Plaintiff at the request of Dr. Boyer. Plaintiff complained of right elbow pain and burning numbness and tingling, which interfered with daily functioning. Plaintiff wore a sleeve which helped. Plaintiff reported taking no medications. Physical examination showed that Plaintiff was in no acute distress. Dr. Keener assessed right cubital tunnel syndrome with medial epicondylitis and discussed surgical options. Dr. Keener also discussed that Plaintiff's smoking could hinder his healing. Dr. Keener performed an open debridement, right elbow medial epicondyl and right ulnar nerve transposition on January 28, 2010. During a follow up visit on February 3, 2010, Plaintiff reported doing well with minimal pain. Dr. Keener recommended doing gentle home exercises, working on range of motion, and stretching. He advised a 1 to 2 pound lifting restriction. On March 3, 2010, Plaintiff continued to report that he was doing well, although he had some morning stiffness. (Tr. 594-609)

Plaintiff returned to Dr. Richardson on March 5, 2010, complaining of soreness in his low back and legs. Dr. Richardson prescribed Percocet, OxyContin, and Neurontin. On March 30, 2010, Plaintiff rated his low back pain as an eight on a scale of one to ten. Dr. Richardson refilled Plaintiff's pain medications, as well as his Xanax prescription. Plaintiff returned on April 30, 2010 reporting that he felt tired and that his pain was a seven to ten. Dr. Richardson refilled Percocet, OxyContin, and Neurontin. On May 7, 2010, Dr. Richardson administered 3 trigger point injections. He refilled prescriptions for Percocet and OxyContin on May 28, 2010 and July 2, 2010. (Tr. 614-17, 819-20) Plaintiff saw Dr. Garcia on June 23, 2010, complaining of right elbow pain. He reported that he remained employed. Dr. Garcia assessed right elbow and shoulder pain, as well as neck pain. He prescribed Hydrocodone, Ibuprofen, and Flexeril. (Tr. 848)

On July 8, 2010, Plaintiff saw Dr. Adam LaBore for complaints of left neck and shoulder pain for six months. Pain varied from sharp to burning and aching and was moderate to severe in intensity. He also felt pain in his right neck and shoulder. Plaintiff denied taking medications, and stated he was disabled. He reported using illegal drugs in the past. Plaintiff was in no apparent distress. X-rays of the cervical spine revealed mild degenerative disc and spondylotic changes with evidence of central canal stenosis at C4-5. Dr. LaBore assessed radicular neck pain with signs and symptoms of nerve root impingement. Dr. LaBore recommended prednisone and Naprosyn. An MRI performed on August 10, 2010 revealed mild degenerative changes in the cervical spine, including disc bulges or protrusions at each level, with effacement of the ventral subarachnoid space at C3-C4 and C4-C5, but no significant canal stenosis or cord compression. (Tr. 798-812)

Dr. Garcia assessed Plaintiff on August 11, 2010 for complaints of pain in his neck and left shoulder. He requested Vicodin, but Dr. Garcia prescribed Hydrocodone. (Tr. 849) Plaintiff returned to Dr. Richardson on September 7, 2010, complaining of lower back pain and reporting that he used a cane. Dr. Richardson administered 3 trigger point injections and refilled pain and anti-anxiety medications. From October 1, 2010 to January 4, 2011, Plaintiff saw Dr. Richardson on a monthly basis. He continued to complain of chronic pain in his lower back, for which Dr. Richardson refilled Plaintiff's narcotic pain prescriptions. (Tr. 821-26) Plaintiff also visited Dr. Garcia on October 11, 2010 seeking refills of pain medication. He complained of abdominal pain on December 15 and 27, 2010. (Tr. 850-52)

Twan Phanijphand, D.O., examined Plaintiff at the request of Dr. Garcia on January 13, 2011. Plaintiff complained of abdominal pain and gastroenteritis. Dr. Phanijphand prescribed Align and recommended a colonoscopy if the symptoms did not improve. (Tr. 816-17)

On August 2, 2010, Dr. Alan H. Morris performed a consultative orthopedic evaluation. Prior medical records from Plaintiff's pain management physician showed previous L-3/4 compression fractures and pin in the right knee. Plaintiff reported that he was unemployed since September, 2006 and that he stopped working as an auto detailer due to pain in his knee and low back. He complained of back, knee, right, elbow, right shoulder, and neck pain. Plaintiff further reported numerous functional limitations, including the inability to walk without a cane. Dr. Morris stated that Plaintiff appeared reliable. Plaintiff was unable to heel-toe walk, do a tandem gait, or squat. He could dress and undress, as well as rise from a chair or get on/off the examining table with a cane. Lower extremity deep tendon reflexes were 2/4 in both knees with 4/5 anterior tibial strength. He had a very weak right hand grip of 1/5 compared with 5/5 on the left. Range of motion values showed limited right knee and lumbar motion. Dr. Morris assessed arthralgia, right knee; low back pain with history of compression fractures; entrapment syndrome, right ulnar nerve, status post ulnar nerve transposition, and neck pain. (Tr. 771-74, 781-82)

Dr. Morris also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). He opined that Plaintiff could lift up to 10 pounds occasionally and could never carry any weight. He could sit for 30 minutes, stand for 20 minutes, and walk for 5 minutes without interruption. In addition, Plaintiff could sit for 4 hours, stand for 3 hours, and walk for 1 hour in an 8 hour work day. However, he needed to frequently change from sitting to standing. Plaintiff required the use of a cane to ambulate but could walk 5 feet without a cane. Dr. Morris further opined that Plaintiff could never reach overhead, handle, finger, feel, or push/pull with his right hand, and he could only occasionally reach in other directions on the right. He could frequently perform all use of hands activities with his left hand. Plaintiff could also frequently use both feet to operate

19

foot controls.  Dr. Morris stated that Plaintiff could never perform any postural activities such as climbing or stooping.  Plaintiff also had environmental limitations such as never working at unprotected heights, moving mechanical parts, or operating a motor vehicle.  Dr. Morris believed Plaintiff could travel without a companion, prepare simple meals, and care for his personal hygiene. (Tr. 775-80)

Also on August 2, 2010, Kimberly R. Buffkins, Psy.D., performed a consultative psychological evaluation.  Plaintiff reported a history of learning disability and chronic pain.  He stated that he had daily low back and knee pain and that he was depressed all the time.  He also reported panic attacks during which he experienced chest pain, difficulty breathing, faintness, and tingling.  Plaintiff reported problems with domestic violence and prior incarcerations, as well as prior marijuana use and cocaine problems.  Plaintiff's eye contact was poor and his mood depressed.  Dr. Buffkins found moderate impairment to activities of daily living; mild to moderate impairment in social functioning; appropriate grooming; and adequate concentration, persistence, and pace.  The Wechsler Adult Intelligence Scale showed borderline range of intelligence, and his Full Scale IQ was also in the borderline range.  Scores on the Wechsler Memory Scale ranged from extremely low to borderline.  Dr. Buffkins diagnosed depressive disorder, NOS; anxiety disorder, NOS; borderline intellectual functioning; and a GAF of 60-65.  She opined that, although Plaintiff's depressive and anxiety symptoms appeared in the medical evidence, she could not make a specific diagnosis due to inadequate information and documented history.  Dr. Buffkins stated that Plaintiff's problems appeared to have caused significant distress and impairment in the occupational functioning.  She found his prognosis to be fair and opined that appropriate interventions could enhance his ability to maximize his potential.  Plaintiff was incapable of managing supplemental funds.  (Tr. 785-91)

In a Medical Source Statement (Mental), Dr. Buffkins assessed mild limitations to Plaintiff's ability to understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions. He was moderately limited in understanding and remembering complex instructions; carrying out complex instructions; and making judgments on complex work-related decisions. Further, Dr. Buffkins found mild limitations in Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers. He was moderately limited in responding appropriately to unusual work situations and changes in a routine work setting. The limitations were caused by borderline intellectual functioning and problems with depression and anxiety. (Tr. 792-94)

In addition to the medical examination records, Dr. Richardson issued a physician statement, as well as a letter. On September 2, 2008, Dr. Richardson stated that Plaintiff could only stand/walk or sit for 2 hours during an 8 hour work day and lift/carry a maximum of 5 pounds. He could not perform any body motions except for occasional reaching. Dr. Richardson stated that Plaintiff was disabled for physical work. Further, Dr. Richardson opined that Plaintiff had marked limitations in concentration, persistence, and pace, as well as continual episodes of decompensation in work settings. Dr. Richardson supplemented his statement on June 8, 2010, indicating that Plaintiff's condition had not worsened and that it would probably persist. The length of time was unknown and could be permanent. Plaintiff had no limitations due to the effects of medications. On June 14, 2010, Dr. Richardson clarified that the restrictions he set forth in 2008 had not changed. (Tr. 750-67)

In a letter dated November 10, 2009, Dr. Richardson stated that he had treated Plaintiff for chronic back pain following a compression fracture of the L4, L5 vertebra. The pain was well managed until Plaintiff had knee surgery in 2005, as well as another fall. The resulting changes in gait

and posture caused severe low back pain. Because of pain, Plaintiff went to urgent care at least once a month for treatment. His activities were severely limited, and he was unable to walk very far. He had difficulty standing, as well as lifting and carrying even small weights up to 5 pounds despite strong pain medication. Dr. Richardson did not believe that Plaintiff was physically able to do any kind of physical work. (Tr. 768)

Plaintiff also submitted records from Dr. LaBore, Dr. Witte, Dr. Richardson, Dr. Garcia and the Clayton Sleep Institute. These records are dated after the close of the administrative record, and the vast majority after the ALJ issued his opinion on March 21, 2011. (Tr. 856-902) However, the Appeals Council made this additional evidence part of the record. (Tr. 5) The Appeals Council found, however, that the information did not provide a basis for changing the ALJ's decision because it was not new and material. (Tr. 1-2)

### IV. The ALJ's Determination

In a decision dated March 21, 2011, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. He had not engaged in substantial gainful employment since October 4, 2008, the amended alleged disability onset date. The ALJ further found that Plaintiff's severe impairments included mild L5 fracture (chronic back pain), knee surgery, right ulnar nerve surgery (DJD), mild cervical degenerative disc disease (chronic neck pain), and borderline intellectual functioning. The ALJ assessed Plaintiff's allegations of depression and anxiety, noting that the medical evidence was devoid of any ongoing mental health treatment or objective medical observations by any treating psychiatrist or psychologist. Therefore, the ALJ determined that Plaintiff's depression and anxiety were non-severe. (Tr. 9-12)

The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically assessed Plaintiff's mental impairment under listing 12.05 pertaining to mental retardation. He noted that Plaintiff was able to care for his own personal needs, could follow directions, had scale IQ scores higher than the listing, and did not have the requisite marked limitations. (Tr. 12-13)

After carefully considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to lift 50 pounds occasionally and 20 pounds frequently; stand/walk six hours out of eight; and occasionally crouch and climb stairs and ramps. He could never crawl or climb ropes, ladders, or scaffolds. Further, Plaintiff needed to avoid concentrated exposure to extreme cold, wetness, humidity, and hazards of heights. He could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work related decisions; respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; adapt to routine simple work changes; and perform repetitive work according to set procedures, sequence, or pace. The ALJ considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. (Tr. 13-14)

Specifically, the ALJ assessed the medical evidence, including elbow surgery, MRIs and x-rays, and pain treatment from Dr. Richardson. The ALJ noted the lack of significant atrophy, which was inconsistent with Plaintiff's allegations of severe and debilitating limitations. The ALJ further noted the lack of clinical or objective findings indicating that Plaintiff's pain prevented him from performing his past relevant work. In addition, the ALJ noted Plaintiff's poor work history and a

motivation to exaggerate his symptoms to receive benefits, as well as inconsistencies in his testimony. Further, the ALJ did not give significant weight to Dr. Richardson's statements because they were not supported by his treatment notes. The ALJ credited the testimony of the medical advisors, Dr. Winkler and Dr. Reid. (Tr. 14-16)

The ALJ then determined that Plaintiff was unable to perform any past relevant work. However, in light of his younger age, limited education, work experience, and RFC, he could perform work at the medium level. Plaintiff's additional limitations eroded the unskilled medium occupational base, but in reliance on the VE, the ALJ found that other jobs existed in significant numbers in the national economy which Plaintiff could perform. These jobs included auto detailer and banquet set-up person. The ALJ thus concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 4, 2008 through the date of the decision. (Tr. 16-17)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a). To be eligible for disability insurance benefits, a plaintiff must establish that she was disabled prior to the expiration of his insurance. Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009) (citation omitted). In determining whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of

impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[4] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

In his Brief in Support of the Complaint, Plaintiff asserts that substantial evidence does not support the ALJ's determination because the ALJ's RFC determination failed to address or distinguish the opinions of the state agency medical consultants; the ALJ failed to properly weigh and consider evidence provided by treating physicians; the ALJ failed to consider Plaintiff's somatoform disorder as a severe mental impairment; and the ALJ erred in finding Plaintiff could perform other

---

[4]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

light work.  The Defendant responds that the ALJ properly determined the severity of Plaintiff's mental impairments; properly weighed the medical opinions; and properly found that Plaintiff could perform work at the medium level.  The undersigned finds that substantial evidence does not support the ALJ's determination such that the case should be remanded.

## A.  Consideration of State Agency Medical Consultants

The Plaintiff argues, and the undersigned agrees, that the ALJ failed to consider or address the opinions of the examining medical consultants, and specifically Dr. Morris.  Review of the ALJ's opinion in light of the medical evidence demonstrates that the ALJ mentioned only the consultative evaluation of Dr. Kimberly Buffkins, which the ALJ found supported the determinations that Plaintiff's borderline intellectual functioning did not meet a listing and that his depression and anxiety were non-severe.  However, the decision is devoid of any mention of Dr. Morris' consultative examination, which set forth numerous functional restrictions.[5]

Under Social Security Ruling (SSR) 96-6p, the ALJ has the authority to rely upon the opinion of a non-examining source.  "Findings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert evidence of nonexamining sources at the administrative law judge . . . level[ ] of administrative review."  Social Security Ruling, SSR 96-6p, 61 Fed. Reg. 34466-34468 (July 2, 2006).  Further, "[a]dministrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions."  Id.

---

[5] The ALJ's sole acknowledgment of Dr. Morris was to state that Plaintiff "was using a cane when he saw Dr. Morris."  (Tr. 15)

In this case, Dr. Morris performed a consultative examination of Plaintiff, at the request of the ALJ, and completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). This statement included assessments of Plaintiff's RFC and contained restrictions to lifting, carrying, walking, sitting, standing, and using his right hand. (Tr. 771-82) Notably, Dr. Morris' findings are inconsistent with the ALJ's RFC determination. While the Defendant contends that Dr. Morris' assessment does not constitute substantial evidence, Defendant fails to address the fact that any mention of Dr. Morris' consultative opinion is missing from the ALJ's opinion. Because the ALJ's decision fails to acknowledge or even intimate that he considered Dr. Morris' assessment, let alone explain the weight given to Dr. Morris' opinion, the decision "on its face runs afoul of the dictates of SSR 96-6p." Bordeaux v. Astrue, No. 4:11CV876 FRB, 2012 WL 5508376, at *13 (E.D. Mo. Nov. 14, 2012). Further, because the ALJ's "decision lacks any discussion reconciling the inconsistency between [Dr. Morris'] more restrictive assessment and the ALJ's RFC determination", the ALJ's decision that Plaintiff could perform work at the medium level. Id. at **13-14.

Thus, the undersigned finds that this case should be remanded to the Commissioner for proper assessment of Plaintiff's functional restrictions in light of the entire medical record, including assessments by State agency consultants as set forth in SSR 96-6p. The Court also notes that the Appeals Council considered and made part of the record additional evidence submitted by the Plaintiff after the ALJ's determination. On remand, the ALJ should consider this evidence in addition to the other medical evidence in the record.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


                                                                               /s/ Terry I. Adelman
                                               UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of August, 2013.
    .